UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

T.H., *et al.*,

                                        Plaintiffs,

                    -v-

THE ARCHDIOCESE OF NEW YORK,
*et al.*,

                                        Defendants.

---

23-CV-2154 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs T.H., a minor, and her father Rafael Hernandez bring this action against Defendants the Archdiocese of New York, St. Margaret of Cortona-St. Gabriel Catholic Parish, St. Margaret of Cortona School ("St. Margaret"), and the school's principal, Hugh M. Keenan. Plaintiffs allege that Defendants, by inadequately addressing the bullying T.H. experienced from kindergarten through eighth grade, violated Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and state and city law, including Title 8 of the New York City Human Rights Law, § 296(4) of the New York State Human Rights Law, and New York common law under theories of negligent hiring, retention and supervision; negligence; loss of services; and negligent infliction of emotional distress.

Before the Court is Defendants' motion for summary judgment. For the reasons that follow, that motion is granted.

## I.    Background

### A.    Factual Background

The following facts are drawn from Defendants' Rule 56.1 Statement (ECF No. 35 ("Defs.' SOMF")), Plaintiffs' Rule 56.1 Counterstatement (ECF No. 48 ("Pls.' SOMF")), and

Plaintiffs' Complaint (ECF No. 1 ("Compl.")).  These facts are undisputed unless otherwise noted, and, for the purpose of resolving the motion for summary judgment, they are construed in the light most favorable to the Plaintiffs as the non-moving parties.  *See Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

T.H. was diagnosed with a "speech delay" when she was about three years old.  (Compl. ¶ 47.)  T.H. received speech therapy "until about her 3rd or 4th grade in 2017," and occupational therapy until "about 2014-2015."  (Defs.' SOMF ¶¶ 20-21.)  T.H. also "had a special education teacher beginning in nursery school until the 3rd or 4th grade."  (*Id.* ¶ 22.)  By the fourth grade, T.H. had completed all of her special education services, and no longer received supplemental support for her disability.  (*Id.* ¶ 23.)

T.H. attended St. Margaret from 2012 to 2022, completing kindergarten to eighth grade. (Defs.' SOMF ¶ 1.)  Defendant Keenan was the principal throughout this time.  (*Id.* ¶ 3.)  After her first year at St. Margaret, T.H.'s parents allege that they followed the recommendation of Principal Keenan and other educators and enrolled her in a second year of kindergarten to help her to become "academically successful."[1]  (Compl. ¶¶ 59-62.)

During this repeated year of kindergarten, T.H.'s peers at St. Margaret began to bully her. (*Id.* ¶ 62.)  Children would taunt T.H. for having to repeat kindergarten, saying things like: "[W]hy are you still in Kindergarten?!; Why are you not in 1st grade already?; You look like you should be in first grade, you're so big?!"  (*Id.* (quotation marks omitted).)  T.H. also began to feel isolated from her peers.  (*Id.* ¶ 65.)  She was excluded from sitting with one group of girls at lunch or playing with them at recess, and they would "all whisper secrets in front of her."  (*Id.*)

---

[1] In their answer, Defendants denied knowledge that any staff member at the school counseled the Hernandez family to hold T.H. back a year.  (ECF No. 13 ¶¶ 59-62.)

One day at recess during her second year of kindergarten, T.H. was playing the game "horse and buggy" with other students, in which "a student would have the jump rope around the middle of their body, and two students would be behind them.  The student portraying the horse would run and pull the other students behind them."  (Defs.' SOMF ¶ 34.)  During this game, T.H. tripped on the jump rope and fell (*id.*), causing her to need stitches above her right eyebrow. (Compl. ¶ 70.)  Plaintiffs allege that this incident was "a purposeful deliberate act."  (*Id.* ¶ 68.) After this incident, St. Margaret prohibited kindergartners from playing with jump ropes and administrators spoke to the students involved in the incident about how to play with the jump rope safely.  (Defs.' SOMF ¶¶ 35-36.)

The following year, in first grade, T.H.'s mother, Mrs. Hernandez, notified T.H.'s teacher that "T.H. was being teased by other students in the first grade and that she had no one to play with during recess."  (*Id.* ¶ 41.)  Mrs. Hernandez met with the teacher to discuss this.  (*Id.* ¶ 42.)

T.H. and her parents do not recall complaining to the school about any bullying that occurred during T.H.'s second, third, or fourth grades.  (*Id.* ¶¶ 51, 56, 61.)

In fifth grade, Mrs. Hernandez complained twice to T.H.'s teacher about several girls in the grade "whispering, pointing, isol[ating] and ignoring [] T.H. at lunch and at recess" (*id.* ¶¶ 64-65), and about a "catfishing" incident where two girls texted T.H. "pretending to be a boy" (*id.* ¶ 70) and "saying very sweet things to get her hopes up and then to have her crash very hard" (Compl. ¶ 78).

T.H. and her parents do not recall reporting any bullying that occurred during T.H.'s sixth grade year, which was remote from March 2020 onwards, or in seventh grade, during which the Hernandez family "chose to keep T.H. fully remote for the entire [year]."  (Defs.' SOMF ¶¶ 76-78, 82-85.)

In December of T.H.'s eighth grade year, Mrs. Hernandez emailed Principal Keenan:

I wanted to make you aware an incident that occurred last Thursday in school. (T.H.) was told by [J], that [E] and [A] said "(T.H.) sounds and looks retarded". She has visibly sunk back into a very withdrawn depressive state we noticed over the weekend and finally she shared what was triggering her. We have also noticed some of her grades dropping which really is not like (T.H.). She has always had to work so hard. However it appears she has stopped participating in class in fear of being mocked. We have provided her with all the emotional as well as professional help possible. However particular cruel words that hurt so deeply should, should not be tolerated. I ask that you handle this in a sensitive manner. Since (T.H.) also shared that [A] has always been especially mean to her since [A] got in trouble in 4th grade for "catphising" (T.H.). An incident I brought to Ms Cuko, in retrospect I wish I had also notifies you. But it appears its ongoing even after a year and half of Covid lock down. Thank you sincerely for your kindness and attention to this matter. [2]

(Compl. ¶ 87.) Principal Keenan spoke separately with all three girls, and J admitted to calling T.H. "retarded" while A and E denied saying that. (Defs.' SOMF ¶¶ 95-97.) All three girls "were reprimanded verbally and given a warning that there would be severe consequences if their behavior was not exemplary. They were also told to stay away from T.H." (*Id.* ¶ 98.)

Later that month, T.H. had her first sleepover at her friend N's house. (*Id.* ¶ 105; Compl. ¶ 89.) However, T.H. recalled N giving her "the silent treatment during the sleepover" (Defs.' SOMF ¶ 106), taking her phone and sending "flirty, suggestive embarrassing messages" from T.H.'s Snapchat account, and forcing T.H. into the bathroom to wash off her mascara (Compl. ¶ 93). T.H. later told another girl at school that "the sleepover was not fun." (*Id.* ¶ 95.) This girl "reported back to [N] exaggerated details in order to get her angry with [T.H.]." (*Id.*) This culminated on January 7, 2022, with N sending T.H. "over fifteen vicious voice recordings from the Snap Chat application . . . accusing [T.H.] of being 'a liar,' a 'shit-talker' and reprimanding her for sharing information with her own mother." (*Id.* ¶ 100.)

---

[2] The Court abbreviates the names of the three girls accused of bullying T.H. to protect the identity of minors.

"A few minutes after" N sent the final voice recording, T.H. "went to kitchen cabinet and attempted to commit suicide by ingesting [pills]."[3] (*Id.* ¶ 101.)  After this suicide attempt, the Hernandez parents informed Principal Keenan, who "spoke with N and her father."  (Defs.' SOMF ¶¶ 111-12.)  T.H. returned to St. Margaret after her suicide attempt and was temporarily seated near one of the students alleged to have bullied T.H. until the teacher could re-arrange the class seating plan to accommodate the needs of other classmates.  (ECF No. 52 at 5; ECF No. 46-4 at 287-89.)

T.H. ultimately graduated from St. Margaret in June 2022, receiving a final grade of an 83 in eighth grade.  (Defs.' SOMF ¶¶ 121-22.)

### B.    Procedural Background

Plaintiffs commenced this action on March 14, 2023.  (ECF No. 1.)  Defendants answered on May 18, 2023.  (ECF No. 13 ("Answer").)

Defendants moved for summary judgment on August 9, 2024.  (ECF No. 34.)  Plaintiffs opposed the motion on October 14, 2024 (ECF No. 47), and Defendants replied in further support of their motion on November 18, 2024 (ECF No. 51 ("Reply")).

## II.    Legal Standard

A court must grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is only appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for

---

[3] Defendants deny knowledge of this timeline of events and of the circumstances of the attempted suicide.  (Answer ¶ 101.)

the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, a court "must resolve all ambiguities and draw all inferences in favor [of] the nonmoving party." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023).

In moving for summary judgment, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; rather, it "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (quotation marks omitted). "The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (cleaned up) (quoting *Anderson*, 477 U.S. at 252).

## III. Discussion

Defendants move for summary judgment on Plaintiffs' ADA and Section 504 claims, arguing that these discrimination claims fail as a matter of law because any bullying against T.H. did not rise to an actionable level under federal law and that Defendants were not deliberately indifferent to it. (ECF No. 38 ("Mem.") at 11-12.) Defendants also move for summary judgment on the state and city claims, arguing that the Court should decline to exercise supplemental jurisdiction over those claims, and, alternatively, that they fail as a matter of law. (*Id.* at 20-21.)

A.    **ADA and Section 504**

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Section 504 expresses a similar scope of protection: "No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Second Circuit, noting the similarity in the two statutes' language, directs courts to "analyze such claims together." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015).

A plaintiff bringing claims under the ADA and Section 504 must establish a *prima facie* violation by demonstrating: "(1) that she is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." *Harris v. Mills*, 572 F.3d 66, 73-74 (2d Cir. 2009).

In their motion for summary judgment, Defendants do not challenge that T.H. qualifies under the ADA as disabled or that St. Margaret receives federal funding and is thus subject to both statutes.[4] Thus, the application of the ADA and Section 504 turns on the final prong:

---

[4] Defendants do argue in their reply brief that "there is insufficient evidence to establish that T.H. even has a disability" (Reply at 3); however, that argument is waived. *See In re Fosamax Prods. Liability Litig.*, No. 06-MD-1789, 2013 WL 6669706, at *3 (S.D.N.Y. Dec. 18, 2013) (discussing the general rule that new arguments may not be raised in reply briefs); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) (similar).

whether T.H. was denied the opportunity to participate in St. Margaret's educational offerings or discriminated against by St. Margaret because of her disability.

Here, Plaintiffs allege that St. Margaret deprived T.H. of educational opportunities and discriminated against her by insufficiently responding to peer-on-peer harassment. While the Second Circuit has yet to decide the applicable standard for harassment cases under the ADA and Section 504 for harm caused by student-on-student bullying, district courts in this Circuit have looked to the Title IX case *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). *See Close v. Bedford Cent. Sch. Dist.*, No. 23-CV-4595, 2024 WL 3427213, at *10 (S.D.N.Y. July 16, 2024); *T.J. ex rel. B.W. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, No. 17-CV-9592, 2019 WL 13170168, at *13 (S.D.N.Y. Sept. 30, 2019) (collecting cases). While *Davis* is a Title IX harassment case, the statutory language on which the Supreme Court relied in crafting a standard for peer-on-peer harassment mirrors that of Section 504.[5] This Court thus agrees with the other courts in this Circuit and adopts the *Davis* framework to analyze these claims.

The *Davis* test, as applied in the ADA and Section 504 context, requires a plaintiff to adequately allege that "(1) he was harassed on the basis of his disability; (2) the harassment was so severe, pervasive, and objectively offensive that it altered his education; (3) the school district

---

[5] In *Davis*, the Supreme Court largely relied on the phrase "subjected to discrimination," a phrase also found in Section 504, to craft its standard for peer-on-peer harassment. *Davis*, 526 U.S. at 644-45 ("The language of Title IX itself . . . cabins the range of misconduct that the statute proscribes. The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." (quoting *Random House Dictionary of the English Language* 1415 (1966) and *Webster's Third New International Dictionary* 2275 (1961))).

had actual notice of the disability-based harassment; and (4) the school was deliberately

indifferent to it."  *Close*, 2024 WL 3427213, at *10 (quotation marks omitted).

Defendants argue that the harassment T.H. experienced did not rise to the level of severe

and pervasive, and that St. Margaret was not deliberately indifferent to the harassment that did

occur.  (Mem. at 10-12.)  The Court addresses each argument in turn.

### 1.    Severe and Pervasive

Because neither the Supreme Court nor the Second Circuit has articulated a standard for

severe or pervasive peer-on-peer harassment that would trigger liability under the ADA or

Section 504, the Court again looks to parallel Title IX caselaw.  In *Davis*, the Supreme Court

found that frequent lewd comments and attempts to touch a fifth-grade female student's breasts

and genital area rose to the level of severe and pervasive.  *Davis*, 526 U.S. at 633-35.  However,

the Court cautioned that, in a school context, "children may regularly interact in a manner that

would be unacceptable among adults," because "students are still learning how to interact

appropriately with their peers."  *Id.* at 651.  Because of this, the Court noted, school children

"often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is

upsetting to the students subjected to it."  *Id.* at 651-52.  "Damages are not available for simple

acts of teasing and name-calling among school children, however, even where these comments

target differences in gender."  *Id.* at 652.

The Second Circuit, in a summary order, followed the *Davis* approach, holding that

conduct involving three emails sent to a ninth-grade student disparaging her appearance and

soliciting her for sex "falls well short of the kind of harassment found actionable under Title IX."

*R.S. v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 371 F. App'x 231, 233 (2d

Cir. 2010) (summary order).  By contrast, in ruling on a qualified-immunity defense in a case,

brought under 42 U.S.C. §§ 1981 and 1983 and alleging peer-on-peer harassment against a Black

kindergartner, the Second Circuit relied on *Davis* to note that the use of the "n-word," as well as at least two other instances of racial harassment, "raises a question of severe harassment going beyond simple teasing and name-calling." *DiStiso v. Cook*, 691 F.3d 226, 242-43 (2d Cir. 2012).[6]

Applying the severe and pervasive standard to the ADA and Section 504 contexts, the Court concludes that largely isolated instances of name calling and teasing, with only one instance of a likely disability-related insult, are not actionable harassment under the statutes.  The one recent name-calling episode Plaintiffs describe that was arguably connected to T.H.'s disability was when a student told T.H. that two other girls had said "(T.H.) sounds and looks retarded."[7]  (Compl. ¶ 87.)  While this word is unquestionably unkind and hurtful, one instance of a peer repeating that she had heard others saying the word does not rise to the level of severe or pervasive required to attach liability under the ADA or Section 504.  And though T.H. heard a student call her "so big" for a kindergartner when she repeated the grade (Compl. ¶ 62), connecting that comment to her speech disability is attenuated.  Even if the Court were to make that inferential jump, this second isolated comment does not rise to the level of severe and pervasive harassment.

---

[6] In understanding the split between these two cases, it is important to note that, due to the history surrounding it and the contexts in which it is used as an insult in the modern day, the "n-word" carries a weight that most other identity-based insults do not.  *See, e.g.*, *Spencer v. Glob. Innovative Grp., LLC*, No. 17-CV-7604, 2023 WL 6633860, at *10 (S.D.N.Y. Oct. 12, 2023).

[7] The Court notes that while the word "retarded" has become known in the modern day as an offensive name for disabled people, it has unfortunately also been a common playground insult wielded more generically against non-disabled students.  (*See* Mem. at 17 ("Plaintiffs have presented no evidence whatsoever that T.H. was called retarded or was catfished by other students because of her alleged learning disability or any discriminatory animus towards her.").)

The remaining bullying episodes, including T.H.'s fall after the horse-and-buggy game in kindergarten, the catfishing episode, and the mean messages from N after T.H. had told another student she did not have a good time at N's sleepover, do not raise a triable issue of fact as to whether they are related to T.H.'s disability. While "[s]tudies have shown that students with a disability, whether it is visible or non-visible, are subject to increased bullying that is often directed at the disability," *T.K. v. N.Y.C. Dep't of Educ.*, 779 F. Supp. 2d 289, 303 (E.D.N.Y. 2011), "district courts in this Circuit have dismissed ADA or Rehabilitation Act claims where a complaint failed to allege that the bullying occurred *because of* the victim's disability," *T.J. on behalf of B.W. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, No. 17-CV-9592, 2019 WL 13170168, at *14 (S.D.N.Y. Sept. 30, 2019) (emphasis in original) (collecting cases). "To hold otherwise would convert the ADA and Rehabilitation Act into generalized anti-bullying statutes." *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 233 (E.D.N.Y. 2015). T.H. certainly had an unpleasant experience with the girls in her class who were unkind to her, but these allegations that have no connection to her disability are not actionable under a federal statute aimed at ensuring disabled students have adequate access to education.

In sum, there remain no genuine issues of material fact as to whether the bullying T.H. experienced, which consisted of a handful of isolated events over the course of nine years at St. Margaret, and only one episode of which was clearly connected to her disability, qualifies as severe and pervasive.

### 2.    Deliberate Indifference

Even if the bullying T.H. experienced at St. Margaret did rise to the level of severe and pervasive harassment, Plaintiffs have also failed to adequately show that there is a triable issue as to whether the school administrators were deliberately indifferent to it.

11

"Deliberate indifference to bullying under *Davis* is found where the [school's] response was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur." *Close*, 2024 WL 3427213, at *11 (quotation marks omitted) (collecting cases).

Such was not the case at St. Margaret. After the horse and buggy game where T.H. tripped and fell, which Plaintiffs allege was an early instance of bullying, St. Margaret banned kindergartners from playing with jump ropes and administrators spoke to the impacted students about playground safety. (Defs.' SOMF ¶¶ 35-36.) And after a student told T.H. she had overheard other girls saying "(T.H.) sounds and looks retarded" (*see* Compl. ¶ 87), Principal Keenan spoke with each of the girls implicated, verbally reprimanded them, told them to "stay away from T.H.," and warned them "that there would be severe consequences if their behavior was not exemplary" going forward (Defs.' SOMF ¶ 98).

Finally, after T.H. returned from school following her attempted suicide, the teacher took only one day to rearrange the classroom to ensure T.H. was seated near students who would best support her and away from students who had allegedly been bullying her. (ECF No. 52 at 5; ECF No. 46-4 at 287-89.) Principal Keenan testified that it took a day to rearrange the classroom in order to accommodate the needs of other special-needs students, including those who need to be seated in certain parts of the classroom to facilitate learning. (ECF No. 46-4 at 288.) Given the accommodations required by federal laws, including the two at issue, to support special-needs children in the classroom, this one-day waiting period was not "clearly unreasonable."

Plaintiffs allege that no "meaningful action was taken" by St. Margaret staff after girls in T.H.'s class sent catfishing text messages to her in fifth grade. (ECF No. Pls.' SOMF ¶ 7.)

12

However, even assuming there was no response from the school, Mrs. Hernandez herself testified that the catfishing occurred over Easter break, likely on T.H.'s older sister's electronic device (ECF No. 46-3 at 104-05), and *Davis* makes it clear that actionable harassment "must take place in a context subject to the school district's control." *Davis*, 526 U.S. at 645. The Court declines to create a standard that would require schools to police activity on students' personal cellphones, accessed at home and under parental supervision.

Ultimately, Plaintiffs "have not plausibly [shown] that the [school] did so little to safeguard the [plaintiff] so 'as to give rise to a reasonable inference that [it] intended for the harassment to occur.'" *Close*, 2024 WL 3427213, at *12 (quoting *DiStiso*, 691 F.3d at 241).

Because no rational juror could find that the conduct against T.H. was severe and pervasive or that St. Margaret was deliberately indifferent to the bullying that did occur, Plaintiffs' claims under the ADA and Section 504 do not survive summary judgment.

### B.    Remaining State and Local Law Claims

After dismissal of the ADA and Section 504 claims, no federal claims remain. A federal court may decline to exercise supplemental jurisdiction over non-federal claims once it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). To guide its discretion in exercising or declining supplemental jurisdiction, courts consider the "familiar factors of judicial economy, convenience, fairness, and comity." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Where, as here, "all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7; *see also Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2022) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), . . . it

should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

The Court declines to exercise supplemental jurisdiction and dismisses Plaintiffs' state and local law claims without prejudice to refiling. *See Cohill*, 484 U.S. at 350.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 34, to enter judgment of dismissal, and to close this case.

SO ORDERED.

Dated: February 3, 2025
       New York, New York

_____
                J. PAUL OETKEN
          United States District Judge